McEvoy, Christine M., J.

INTRODUCTION

Following the suicide of their daughter, Elizabeth H. Shin, a sophomore at the Massachusetts Institute of Technology, the Plaintiffs filed a twenty-five (25)-count complaint against the Defendants Massachusetts Institute of Technology, MIT Medical Professionals, MIT Administrators, and MIT Campus Police Officers. Some of the Defendants have filed for partial or complete summary judgment on varying grounds. For the following reasons, MITs motion for summary judgment on Counts I, II, III and IV is ALLOWED. Dean Arnold Henderson’s and Nina Davis-Millis’ motion as to Counts V and X are ALLOWED and as to Counts VI, VII, VIII, and IX is DENIED. MIT psychiatrists Reich’s, Cunningham’s and Van Niel’s motion as to Counts XV and XVI is DENIED. MIT psychiatrist Girard’s motion as to Count XV and XVI is ALLOWED and as to Counts XI, XII, XIII, and XIV is DENIED.

FACTUAL BACKGROUND Elizabeth’s Freshman Year

Elizabeth Shin (“Elizabeth”) was bom on September 26, 1980, and enrolled at Massachusetts Institute of Technology (“MIT”) in September 1998. Elizabeth lived in Random Hall, a coeducational dormitory that houses both first-year students and upperclassmen.
Elizabeth’s annual tuition and room and board at MIT totaled approximately $35,000.00 for the 1998-1999 academic year. MIT, as a modest sized city, provides a multitude of services to its students, faculty and staff. MIT provides housing, food service, educational and medical services to the members of its community. MIT Medical Services Department offers comprehensive health services funded, in part, by tuition payments and administered by Blue Cross/Blue Shield. Prior to beginning freshman classes, MIT sent Elizabeth information about its Medical Services Department and the health services available to her upon arrival at MIT.
Elizabeth first experienced psychiatric problems at MIT in February 1999, during the spring semester of her freshman year. She was hospitalized following an overdose of Tylenol with codeine. Elizabeth was initially taken to Massachusetts General Hospital by MIT ambulance. From there she was admitted to McLean Hospital (“McLean”) for a one-week psychiatric hospitalization. During her treatment at McLean, Elizabeth revealed that she suffered from mental health problems and engaged in cutting behavior while she was in high school.
After obtaining Elizabeth’s consent, Nina Davis-Mills (“Davis-Mills”), Elizabeth’s housemaster at Random Hall, called Elizabeth’s parents to inform them of their daughter’s hospitalization at McLean. The Shins came to visit their daughter at McLean, where they met with treating clinicians and a social worker. The clini *571 cians at McLean recommended that Elizabeth seek psychotherapy following her discharge from McLean. Prior from her discharge from McLean, Elizabeth’s father, Mr. Shin, brought Elizabeth to MITs Mental Health Services Department to meet with Dr. Kristine Girard (“Girard”), one of the full-time psychiatrists at MIT. Girard discussed treatment options with Mr. Shin and Elizabeth, which included treatment at MIT, referral to a mental health facility outside MIT, or taking a leave from MIT to focus on her treatment elsewhere. Girard recommended that Elizabeth accept a referral for weekly treatment outside MIT, but Elizabeth refused. They agreed that Elizabeth would begin treatment with Girard with appointments every two or three weeks.
On February 23, 1999, Girard treated Elizabeth during a fifty-minute therapy session and diagnosed her with “adjustment disorder.” Girard also noted that Elizabeth was speaking with Counseling and Support Services (“CSS”) Dean Ayida Mtembu (“Mtembu”) to assist her with her academic extensions. On March 11, 1999, Mtembu attempted to contact Girard to discuss Elizabeth’s mental condition because Mtembu learned that Elizabeth made a suicidal comment to her boyfriend who she broke up with two days prior.
On April 7, 1999, Girard treated Elizabeth during a forty-five minute therapy session where Girard noted that Elizabeth was considering transferring from MIT due to her marginal performance in some of her classes. Girard noted that Elizabeth was suffering from “situational issues” and as a plan of treatment, recommended she read “Feeling Good” by David Burns, PhD. On May 3, 1999, Girard again met with Elizabeth who described her own medical condition as “not so good.” Elizabeth explained that she was having conflicts with her boyfriend and poorly performing in some of her classes. Elizabeth told Girard she was going home to live with her parents in New Jersey for the summer break. Girard again diagnosed Elizabeth as suffering from “situational issues” and instructed Elizabeth to return for therapy at the beginning of her sophomore year.

Elizabeth’s Sophomore Year

On October 6, 1999, Mthembu sent Elizabeth to MIT Mental Health for an immediate assessment because she was concerned for Elizabeth’s safely after she told Mthembu she was thinking of killing herself. MIT psychiatrist, Dr. Lesley Egler (“Egler”) treated Elizabeth in a fifty-minute therapy session. Egler noted that Elizabeth was cutting herself without suicidal intent, had a history of mood disorder, was having passive suicidal ideation without any plan or intent, suicidal thoughts had dissipated and were more “abstract” than “concrete,” reduced sleep, erratic eating habits, and that she did not feel she was in any immediate danger of harming herself. Egler advised Elizabeth to return within the next day or two for a walk-in appointment as needed and gave her MITs telephone number for reaching an after-hours mental health clinician.
On October 12, 1999, Girard treated Elizabeth noting Elizabeth was “feeling significantly better this week,” but Girard was cautiously optimistic because Elizabeth’s affect was dramatic with “underlying sadness.”
On November 9, 1999, Elizabeth met with CSS Dean Arnold Henderson (“Henderson”) and told him that she had been cutting herself intentionally. Observing the self-inflicted scratches, Henderson arranged for Elizabeth to meet with a MIT psychiatrist immediately because he believed it was an “urgent” situation.
On December 6,1999, Henderson received an email from Elizabeth’s biology instructor stating that Elizabeth had told a teaching assistant she bought a bottle of sleeping pills with the intention to take them, but had decided not to. Henderson contacted Elizabeth to see how she was doing, and she appeared to be doing well. Nonetheless, Henderson reported the incident to Davis-Millis and Girard.
Elizabeth’s mental health problems resurfaced in March of2000, her second semester of her sophomore year. In the early morning hours of March 18, 2000, a student notified Davis-Millis that Elizabeth was cutting herself and extremely upset. Believing the situation to be an emergency, Davis-Millis persuaded Elizabeth to go to MIT Mental Health early in the morning of March 18, 2000. Elizabeth met with MIT physician, K. Vassen (“Vassen”) who documented that Elizabeth was “very upset.” Elizabeth also told the physician that she did not feel safe alone. Vassen contacted the on-call psychiatrist, Dr. Reisen (“Reisen”), who instructed Vassen to keep Elizabeth there until he arrived. After meeting with Elizabeth, Reisen decided that she could not return to Random Hall and should be admitted for observation at MITs infirmary. Reisen also prescribed a tranquilizer. Reisen then examined Elizabeth on March 19, 2000 and permitted her to return to Random Hall. A student spoke with Elizabeth and reported to Davis-Millis that Elizabeth sounded distraught. Davis-Millis did not relay this information to Reisen or any other person within MIT Mental Health Department.
The next day, with Elizabeth’s consent, Davis-Millis contacted Mr. and Mrs. Shin to inform them that Elizabeth was in the infirmary. Mr. Shin drove to MIT the following day and took Elizabeth home to New Jersey.
Upon returning from spring break, Elizabeth resumed treatment at MIT with a new psychiatrist, Dr. Linda Cunningham (“Cunningham”). Prior to meeting with Elizabeth for the first time on March 23, 2000, Cunningham did not review Elizabeth’s medical record or speak with any other clinician about her mental health history. Cunningham prescribed an *572 anti-depressant, Celexa, and a tranquilizer. Ultimately, Cunningham diagnosed Elizabeth to be suffering from borderline personality disorder and depression.
Between the end of March 2000 through April 10, 2000, Davis-Millis began receiving frequent reports from Random Hall students and Graduate Resident Tutors (“GRTs”) indicating that Elizabeth’s mental health was deteriorating.
On March 26, 2000, Davis-Millis, at the request of Cunningham through Henderson, discouraged Elizabeth from pursuing her earlier mentioned desire to move out of Random Hall. On March 29, 2000, Henderson counseled Elizabeth after Davis-Millis communicated her and other Random Hall persons’ concern that Elizabeth might harm herself. On that day and the following day, Henderson began to speak with Elizabeth’s professors about postponing her examinations scheduled for the following week.
At 11:00 a.m. on March 30, 2000, Elizabeth met with Cunningham where Cunningham diagnosed Shin as suffering from a major depressive episode - “severe.” At Cunningham’s request, Elizabeth returned that day at 3:00 p.m. and Cunningham increased Shin’s daily dosage of Celexa, continued the prescription for the tranquilizer, and informed Elizabeth that she would tiy and locate an outside therapist for her. Cunningham noted that Elizabeth was having “recurrent suicidal gestures” and her condition was “deteriorating” regarding her ability to cope with stress associated with academic pressures. Cunningham further documented that Elizabeth might be required to be hospitalized.
On April 3, 2000, Elizabeth contacted Henderson requesting that he speak with a professor about postponing an exam Elizabeth originally told the professor she would be able to take as scheduled. Henderson obliged Shin’s request and continued to stay in contact with Davis-Millis regarding Elizabeth’s condition.
On April 4, 2000 Elizabeth visited the MIT Mental Health Department as a walk-in and spoke with Dr. Lili Gottfried (“Gottfried”). Elizabeth was unable to tell Gottfried why she had come in that day. On the same day, at the recommendation of Cunningham, Elizabeth met with Eleanor Temelini (“Temelini”), a licensed social worker who specializes in the treatment of patients suffering from BPD.
In late March and early April, Cunningham and Temelini discussed treatment options for Elizabeth outside of MIT. Specifically, they discussed an out-patient treatment program in dialectic behavioral therapy (BPT) at the Two Brattle Center treatment facility in Cambridge, Massachusetts. Elizabeth was scheduled to have an intake appointment on April 11, 2000.
On April 6, 2000, Elizabeth met with Cunningham for a therapy session. Elizabeth commented that she continued to feel “overwhelmed by symptoms” and that she was “feel[ing] isolated.” Cunningham noted that Elizabeth “fluctuates between severe overwhelming anxiely and emptiness, both of which are unbearable and cause disturbing sudden onset of suicidal thoughts.” During this therapy session Cunningham raised the possibility that Elizabeth might need to be hospitalized at Beth Israel Hospital. Cunningham directed Elizabeth to return later in the afternoon for another treatment session.
At 12:30 p.m., Elizabeth returned for a second treatment session with Cunningham. Cunningham discussed the BPT program and Elizabeth seemed “interested.” Cunningham noted that she was considering adding another drug, Resperdal, to Elizabeth’s medicine regime.
On April 5, Margarita Ribas Groeger (“Groeger”), Elizabeth’s Spanish I professor from the prior semester, contacted Davis-Millis to express her concerns about Elizabeth after Maria Skufca (“Skufca”), Elizabeth’s Spanish II professor, indicated she was worried about Elizabeth’s health. Davis-Milks notified Henderson about Groeger’s concerns.
On April 6, Skufca contacted Groeger about cuts on Elizabeth’s arms. Groeger placed four phone calls to Henderson before she spoke with him. The following day Henderson informed Groeger that there was no reason to be concerned because actions were being taken to take care of Elizabeth.
On the evening of April 8, Elizabeth informed another student residing in Random Hall that she was going to kill herself with a knife. The student called MIT Campus Police and officers transported Elizabeth and the other student to MITs Mental Health Center. Upon arriving at the center, Dr. Heller (“Heller”), a MIT staff physician, evaluated Elizabeth. Heller called the on-call psychiatrist, Dr. Van Niel (“Van Niel”) at his home. Van Niel spoke with Elizabeth on the phone for less than five minutes. Determining that Elizabeth was not acutely suicidal, Van Niel instructed Elizabeth to return to Random Hall without any restrictions or planned follow-up.

April 10, 2000: Elizabeth’s Suicide

At approximately 12:30 a.m. on Monday, April 10, 2000, two Random Hall students notified Davis-Millis that Elizabeth had told them that she planned to kill herself that day and requested one of the students to erase her computer files. Davis-Millis testified that she believed Elizabeth intended to cany out her suicide plan. Davis-Millis called MIT Mental Health to contact the on-call psychiatrist. Van Niel called Davis-Millis back and she relayed the students’ revelations to him. Van Niel instructed Davis-Millis to check on Elizabeth, but it would not be necessary to bring her in to the MIT Medical considering (1) Elizabeth had assured him that she was fine and (2) her friends had overreacted on the April 8 episode. He then told Davis-Millis he would contact her at 6:30 a.m.
*573 At 6:30 a.m., Davis-Millis told Van Niel that she had gone to check on Elizabeth, had found all was quiet, and had decided not to wake her. Van Niel asked Davis-Millis to convey her assessment to Henderson, who would be going to the “deans and psychs” meeting later that morning. Davis-Millis contacted Henderson and conveyed the events of the preceding night.
Next, Davis-Millis sent Elizabeth an email asking her to contact Davis-Millis when she woke up. Elizabeth called her at about 9:45 a.m. A disturbing conversation ensued where Elizabeth accused Davis-Millis of wanting to send her home and told her, “You won’t have to worry about me anymore,” or words to that effect. Concerned more than ever, Davis-Millis contacted Henderson following the phone conversation with Elizabeth. He assured her he would convey her concerns to everyone attending the “deans and psychs” meeting.
The aforementioned “deans and psychs” meeting convened at 11:00 a.m. on Monday, April 10th. Henderson, other CCS deans, Reich, Girard, and Gottfried were among those in attendance. The attendees discussed Elizabeth’s case, including her statement to the two students that she intended to kill herself that day.[2] It is contested what, if any, treatment options were discussed at the meeting, including hospitalization, the DBT program, and a medical withdrawal from MIT. At the conclusion of the meeting, Reich made an appointment at Two Brattle Center for Elizabeth for the next day. He left a voice message on Elizabeth’s answering machine and notified her of the appointment and that he would be available for the rest of the day.
That night, shortly before 9:00 p.m., students in Random Hall heard the smoke alarm sounding in Elizabeth’s room. The MIT Campus Police were called and both Campus Police and Cambridge Fire Department personnel responded within minutes. The Campus Police broke open Elizabeth’s door and found her with her clothing engulfed in flames. Officer Munnelly (“Munnelly”) pulled Elizabeth into the lobby area. The MIT police officers put out the flames and immediately began CPR. Elizabeth was transported to the emergency room at Massachusetts General Hospital. In the ambulance, she showed a non-verbal level of consciousness. As a result of the fire, Elizabeth suffered third-degree bums over 65% of her body.
On April 14, 2000, Mr. and Mrs. Shin were notified that Elizabeth suffered irreversible neurological brain damage and recommended termination of life support. At 1:50 a.m. on April 14, 2000, Elizabeth Shin was pronounced dead as a result of injuries suffered in the fire.
On April 18, 2000, the medical examiner determined that the cause of death was “self-inflicted thermal bums.” Reich and MIT Chief of Police concurred that Elizabeth’s death was a suicide.

DISCUSSION

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Gassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Fiesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

I. Claims Against MIT A. Contract Claims (Counts I, II, and III)

In their complaint, the Plaintiffs allege that they had an express and/or implied contract with MIT supported by adequate consideration, or in the alternative through promissory estoppel, to provide necessary and reasonable medical services for the benefit of Elizabeth. Elizabeth was an intended beneficiary under the agreement between MIT and the Plaintiffs.
“To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage.” Guckenberger v. Boston Univ., 974 F.Sup. 106, 150 (D.Mass. 1997). “Even in the absence of consideration to support a binding contractual agreement between the parties, a party reasonably relying on a promise may prevail under a theory of promissory estoppel. [Citations omitted.) A claim in promissory estoppel is essentially a claim in breach of contract; however, the plaintiff must prove reasonable reliance on a promise, offer, or commitment by the defendant rather than the existence of consideration.” Id. (emphasis in original).
While it is well-established that “[t]he relationship between a university and a student is contractual in nature,” courts should be “slow to intrude into the sensitive area of the student-college relationship” and contract law need not be “rigidly applied.” Id. at 150-SI. Under Massachusetts law, statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials can form the basis of a valid contract. See Russell v. Salve Regina College, 890 F.2d 484, 488 (1st Cir. 1989), rev’d on other grounds, 499 U.S. 225 (1991), and reinstated on remand, 938 F.2d 315 (1st Cir. 1991). However, the promise must be “definite and certain so that the *574 promisor should reasonably foresee that it will induce reliance . . .” Guckenberger, 974 F.Sup. at 150.
In Guckenberger, students brought suit against Boston University (“BU”) after BU declined to extend certain accommodations for the students’ learning disabilities. A federal court interpreting Massachusetts law declined to decide whether there was an enforceable contract based on BU brochures.[3] Id. at 151. Instead, it found an enforceable contract between BU and three students based on “specific promises” BU faculty made to the students and their parents concerning the accommodation of their learning disabilities. Id. at 152.
In Morris v. Brandéis Univ., a student challenged the university’s finding that he plagiarized his term paper. The Appeals Court found the basis for a valid contract in the detailed procedural standards of the student judicial process contained in Brandéis’ student handbook.[4] However, the court noted that the “generalized representations” to treat students with “fairness and beneficence” in Brandéis’ promotional materials were “too vague and indefinite to form an enforceable contract.” 60 Mass.App.Ct. 1119, n. 6 (2004) (unpublished opinion).
In the instant case, the Plaintiffs first argue that the representations made in MIT’s Medical Department brochure to incoming students and its Medical Department By-Laws formed the basis of an enforceable contract. While the Plaintiffs do not point to specific language in the MIT Medical Department brochure, the Court looks to the following language:
This gives you access to a full range of physicians and other health care professionals who can care for your physical and psychological needs. These care givers also will help you maintain good health.
It is not unusual for new students, especially those from other countries and cultures, to have some adjustment issues after arriving at MIT. If you have any such difficulties, we offer you — at no charge — a wide range of mental health professionals to assist with this transition.
We want to help you maintain your physical, psychological and emotional well-being, and hope that you will take advantage of our wide range of services.
In the MIT Medical Department By-Laws, the Court looks to the following language:
The Medical Department, under the governance of the Medical Management Board, has the responsibility to provide high quality, low barrier comprehensive health services to the MIT Community . . .
The Plaintiffs also argue that “MIT representatives did induce reliance as shown by Elizabeth’s multiple visits to the MIT mental health services and meetings with Arnold Henderson, Dean of Counseling and Support Services.” Additionally, the Plaintiffs point to a meeting with Davis-Millis in February 1999 where all agreed that Mr. and Mrs. Shin would be kept informed of any subsequent problems with Elizabeth.
The representations made in the MIT Medical Department brochure and By-Laws are merely “generalized representations” of the purpose and medical services available to the MIT community. See Morris, 60 Mass.App.Ct. at 1119, n. 6. Unlike the well-defined policies and procedures found to be the basis of an enforceable contract in Sullivan and Morris, such statements are not “definite and certain” and “too vague and indefinite to form an enforceable contract.” See Guckenberger, 974 F.Sup. at 152; Morris, 60 Mass.App.Ct. at 1119, n. 6.
Likewise, Davis-Millis’ statement that she would keep the Plaintiffs informed of any subsequent developments to Elizabeth’s health does not rise to the level of a “specific promise” that the Plaintiffs relied upon. See Guckenberger, 974 F.Sup. at 152. The other statements, which the Plaintiffs refer to generally and fail to allege with any specificity, allegedly made by MIT medical personnel and administrators were to Elizabeth, and not to the Plaintiffs. Therefore, the Plaintiffs could not have relied on these representations. Moreover, there is nothing in the summary judgment record relating to any “specific promises” MIT medical personnel and administrators made to Elizabeth. Accordingly, there was no contract between MIT and the Plaintiffs and MIT’s motion for summary judgment on Counts I, II, and III is ALLOWED.

B. Violation of c. 93A (Count TV)

Federal courts interpreting Massachusetts law have held that colleges and universities, as charitable corporations, are not engaged in “trade or commerce” for purposes of c. 93A “when [they] undertake! ] activities in furtherance of [their] core mission.” Trustees of Boston Univ. v. ASM Communications, Inc., 33 F.Sup.2d 66, 77 (D.Mass. 1998). In fact, a university is not engaged in “trade or commerce” when they are in relationships that involve services “purely incidental to the university’s educational mission.” Linkage Corp. v. Trustees of Boston Univ., 225 Mass. 1, 25 (1997); see also Thorton v. Harvard Univ., 2 F.Sup.2d 89, 95 (D.Mass. 1998) (university’s student financial aid administration was not engaged in “trade or commerce” because the alleged misleading advertising was taken in furtherance of its core mission, not in a “business context”).
In the instant case, MIT, as a charitable corporation, was not engaged in “trade or commerce” for the purposes of c. 93A because providing medical services was “purely incidental to the university’s educational mission.” See Linkage, 225 Mass, at 25; see also Thorton, 2 F.Sup.2d at 95. Accordingly, MITs motion for summary judgment as to Count IV for violation of c. 93A is ALLOWED.

*575
II. Claims Against MIT Medical Professionals

Defendants Reich, Cunningham, Girard, and Van Niel have moved for partial summary judgment on the Plaintiffs claims of gross negligence (Count XIII), negligent infliction of emotional distress (Count XV), and violation of G.L.c. 93A (Count XVI). Girard also independently moved for summary judgment on all the rest of the claims brought against her.

A.Gross Negligence (Count XIII)

In Altman v. Aronson, the Supreme Judicial Court defined gross negligence as follows:
Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and pal-pableviolation of legal duty respecting the rights of others.
231 Mass. 588, 591-92 (1919).
The Plaintiffs argue that the MIT medical professionals individually and collectively failed to coordinate Elizabeth’s care. As a “treatment team,” the professionals failed to secure Elizabeth’s short-term safety in response to Elizabeth’s suicide plan in the morning hours of April 10. During the “deans and psychs” meeting on the morning of April 10, plans to assist Elizabeth were discussed, however, an immediate response to Elizabeth’s escalating threats to commit suicide was not formulated. By not formulating and enacting an immediate plan to respond to Elizabeth’s escalating threats to commit suicide, the Plaintiffs have put forth sufficient evidence of a genuine issue of material fact as to whether the MIT Medical Professionals were grossly negligent in their treatment of Elizabeth. Accordingly, the MIT Medical Professionals’ partial motion for summary judgment as to Count XIII for gross negligence is DENIED.

B.Violation of G.L.c. 93A (Count XVI)

“[A] claim for the negligent delivery of medical care, without more, does not qualify for redress under [Massachusetts’] consumer protection statute, G.L.c. 93A.” Darviris v. Petros, 442 Mass. 274, 278 (2004). In Darviris, the Supreme Judicial Court held that the plaintiffs claim under c. 93A could not prevail where the plaintiff based its claim on a theory of negligence for allegedly not obtaining informed consent for a medical procedure. Id. at 284. The Court looked to the underlying purpose of the c. 93A and the nature of the plaintiffs’ claim and found that the plaintiffs’ claim did not concern any entrepreneurial or business aspect of the defendant’s medical practice. Id. at 280.
The Plaintiffs’ claim under c. 93A is based on an alleged failure by MIT Medical Professionals to adequately coordinate and provide proper medical health care to Elizabeth. As the plaintiff in Darviris, the Plaintiffs’ c. 93A claim fails to concern any “entrepreneurial or business aspect” of the MIT Medical Professionals’ medical practice. Instead, it merely alleges negligent delivery of medical care. Id.; see also Squeri v. McCarrick, 32 Mass.App.Ct. 203, 207 (1992) (“A negligent act standing by itself does not give rise to a claim under c. 93A. There must in addition be evidence that the negligence was or resulted in an unfair or deceptive act or practice.”). Accordingly, the defendants’ partial motion for summary judgment as to Count XVI, the Plaintiffs’ claim for violation of c. 93A, is ALLOWED.

C.Negligent Infliction of Emotional Distress (Count V)

Under a claim for direct negligent infliction of emotional distress (“NIED”), a plaintiff must prove: (1) negligence, (2) emotional distress, (3) causation, (4) physical harm manifested by objective symtomato-logy, and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. Payton v. Abbott Labs, 386 Mass. 540, 558 (1982).
In Sullivan v. Boston Gas Co., the plaintiffs asserted claims for NIED arising out of injuries sustained as a result of a negligently-caused explosion at the plaintiffs’ home. 414 Mass. 129 (1993.) Regarding the fourth element, one plaintiff alleged to have diarrhea, heart palpitations, sleeplessness, weeping, depression, and feelings of despair as a result of witnessing the destruction of the home. Id. at 132. The other plaintiff alleged to have suffered tension, headaches, gastrointestinal distress, upset stomach, nightmares and depression. Id. at 131.
Noting that the plaintiffs did more than allege “mere upset, dismay, humiliation, grief and anger,” the Sullivan court found that both plaintiffs provided sufficient objective evidence of physical harm to survive summary judgment. Id. at 137, 139.
In the instant case, the only evidence of physical harm the plaintiffs have alleged is that Mrs. Shin felt “tremendous sadness” as a result of Elizabeth’s death. Neither Mr. nor Mrs. Shin sought medical attention to resolve any emotional distress they experienced. Although a medical expert’s testimony is not necessary to establish a claim for NIED, the Plaintiffs fail to corroborate their mental distress with any evidence. See Papasodero v. Thayer & Assoc., Inc., 14 Mass. L. Rptr. 684 (Mass.Super. Apr. 29, 2002) (Fecteau, J.). While the Plaintiffs clearly suffered emotional pain as a result of Elizabeth’s death, they have not provided sufficient evidence of physical harm manifested by objective symptomatology that is beyond “dismay and grief.” See Sullivan, 414 Mass, at 137.
*576 In seeking relief under an alternate theory, the Plaintiffs could also look to the bystander NIED line of cases. In Dziokonski v. Babineau, the Supreme Judicial Court ruled that “the allegations concerning a parent who sustains substantial physical harm as a result of severe mental distress over some peril or harm to his minor child caused by the defendant’s negligence state a claim for which relief might be granted, where the parent either witnesses the accident or soon comes on the scene while the child is still there.” 375 Mass. 555, 568 (1978). In addition to the substantial physical harm requirement, the plaintiff must establish physical proximity to the accident, temporal proximity to the negligent act and familial proximity to the victim. Anderson v. W.R. Grace & Co., 628 F.Sup. 1219, 1229 (D.Mass. 1986). In Ferriter v. Daniel O’Connell’s Sons, Inc., the SJC found that the plaintiffs met the proximily requirements where they witnessed the victim’s injuries at the hospital rather than the scene of the accident. 381 Mass. 507, 518 (1980). Contrastingly, the SJC found that the plaintiffs did not meet the proximity requirements where a mother did not see her son’s injured body until (wenty-four hours after the accident, Stockdale v. Bird & Son, Inc., 399 Mass. 249 (1987), and a mother did not learn of her son’s death until seven hours after a plane crash that occurred over 1,000 miles away, Cohen v. McDonnell Douglas Corp., 389 Mass. 327 (1983).
For the reasons set forth above, the Plaintiffs have failed to demonstrate substantial physical harm. Additionally, the Plaintiffs fail to meet the proximity requirements because they did not see Elizabeth in her injured state until approximately fifteen (15) hours after the accident and the Plaintiffs were in New Jersey at the time their daughter fatally injured herself in Massachusetts. Therefore, the Defendant’s partial motion for summary judgment as to Count XV for negligent infliction of emotional distress is ALLOWED.

D. Girard’s Motion for Summary Judgment

Girard moves independently for summary judgment on all claims against her arguing that she had no duty to Elizabeth and was not a “substantial, contributing cause” to Elizabeth’s death. See Stephakoff v. Kantar, 393 Mass. 836, 840 (1985); Civitarese v. Gorney, 358 Mass. 652 (1971). Girard argues that as of April 2000, there was no physician-patient relationship between herself and Elizabeth because Girard did not personally treat Elizabeth after October 12, 1999. Thus, the Plaintiffs cannot recover under their medical malpractice causes of action. Doherty v. Hellman, 406 Mass. 330 (1989) (physician-patient relationship must be established at time of injury to recover under medical malpractice action).
According to testimony, Girard, among others, attended the April 10,2000 “deans and psychs” meeting. Van Neil relayed the information reported to him by Davis-Millis regarding Elizabeth’s suicide plan she conveyed to students in the early morning hours on April 10. Reich testified that he considered Girard familiar with Elizabeth and relied on Girard’s opinion to form his opinion that Elizabeth was a “very help-resistant person.” Accordingly, the Plaintiffs provided sufficient evidence to raise a genuine issue of material fact as to whether Girard was a part of the “treatment team” treating Elizabeth at the time of the suicide; thereby establishing a physician-patient relationship at the time of Elizabeth’s suicide. Therefore, Girard’s motion for summary judgment as to all claims against her is DENIED.

III. Claims Against MIT Administrators A. MIT Administrators’ Duty to Elizabeth

Defendants Henderson and Davis-Millis have moved for summary judgment on all the counts against them (Counts V-X). Their primary argument rests on the proposition that they, as MIT Administrators, had no duly to prevent Elizabeth’s suicide. Such a view is consistent with the basic tort principle that ordinarily “we do not owe others a duty to take action to rescue or protect them from conditions we have not created.” Cremins v. Clancy, 415 Mass. 289, 296 (1993). More specifically Henderson and Davis-Millis point to Massachusetts law which states that persons who are not treating clinicians have a duty to prevent suicide only if (1) they caused the decedent’s uncontrollable suicidal condition, or (2) they had the decedent in their physical custody, such as a mental hospital or prison, and had knowledge of the decedent’s risk of suicide. Nelson v. Mass. Port Auth., 55 Mass.App.Ct. 433, 435-36 (2002). Henderson and Davis — Millis correctly assert that neither of these two situations occurred in this case and therefore, they owed no duty to prevent Elizabeth’s suicide.
However, Section 314A of the Restatement (2nd) of Torts expressly recognizes that there exist “special relationships” which give rise to a duly to act or protect a person where otherwise no duly would exist:
This Section states exceptions to the general rule, stated in §314 that the fact that the actor realizes or should realize that this action is necessary for the aid and protection of another does not in itself impose upon him any duty to act. The duties stated in this Section arise out of special relationships between the parties, which create a special responsibility, and take the case out of the general rule. The relations [common carrier, innkeeper, land owner, one who is required by law or voluntarily takes custody of another] are not intended to be exclusive, and are not necessarily the only ones in which a duly of affirmative action for the aid and protection of another may be found . . . The law appears, however, to be working slowly toward a recognition of the duly to aid or protect in any relation of dependence . . .
*577 In Mullins v. Pine Manor College, the plaintiff was abducted from her dormitory and raped by an unidentified assailant. 389 Mass. 47 (1983). The SJC held that the college and an administrator owed a duty to exercise care to protect the well-being of their resident students, including seeking to protect them against the criminal acts of third parties. Id. at 51. The Court noted that it found the source for imposing such a duty in “existing social values and customs.” Id.
One year later, in Irwin v. Town of Ware, the SJC further explained the basis for imposing a duty where a “special relationship” exists:
A duty to act with reasonable care to prevent harm to a plaintiff which, if violated, may give rise to tort liability is based on a “special relationship” between the plaintiff and the defendant. See W. Prosser, Torts §56 (4th ed. 1971). While several different categories of such special relationships are recognized in the common law, they are based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so. [Citations omitted.) It has been said that such foreseeability can be based on reasonable reliance by the plaintiff, impeding other persons who might seek to render aid, statutory duties, property ownership or some other basis. As the harm which safely may be considered foreseeable to the defendant changes with the evolving expectations of a maturing society, so change the “special relationships” upon which the common law will base tort liability for the failure to take affirmative action with reasonable care.
392 Mass. 745, 756-57 (1984).
In Irwin, the SJC held that there was a “special relationship between a police officer who negligently fail[ed] to remove an intoxicated motorist from the highway, and a member of the public who suffers injury as a result of that failure." Id. at 762.
More recently, in Schieszler v. Ferrum College, a similar case to the instant case, a U.S. District Court in Virginia denied a motion to dismiss on the issue of whether a duty was owed to a student who committed suicide. 236 F.Sup.2d 602 (W.D. Va. 2002). The campus police and resident assistant responded to a domestic disturbance between the decedent and his girlfriend. Shortly thereafter, the decedent sent a note to his girlfriend indicating that he intended to hang himself with his belt. Id. at 605. The resident assistant and campus police were shown the note and went to the decedent’s room. They found the decedent with bruises on his head that he admitted were self-inflicted. The campus police notified the dean of student affairs. Days later, the decedent wrote to a friend stating “tell Crystal [his girlfriend] that I love her.” The decedent’s girlfriend told the defendants but they took no action. Soon thereafter, the decedent wrote another note stating “only God can help me now,” which his girlfriend again passed on to the defendants. When the defendants visited the decedent’s room, they found that he had hung himself with his belt. Id. The estate of the student filed a wrongful death suit against the college and administrators (dormitory resident assistant and dean of student affairs) alleging (1) that the defendants knew or should have know that the decedent was likely to attempt to hurt himself if not properly supervised and (2) that the defendants were negligent by failing to take adequate precautions to insure that the decedent did not hurt himself. Id. at 605.
Following an analysis similar to the SJC in Mullins and Irwin, the federal court concluded that the defendants owed a duty to the decedent because of a special relationship between them. Id. at 609. The court found that a trier of fact could conclude that there was a “an imminent probability” that the decedent would try to hurt himself, and the defendants had notice of this specific harm. Id.
In the instant case, Henderson and Davis-Millis were well aware of Elizabeth’s mental problems at MIT from at least February 1999. Davis-Millis received numerous reports from students at Random Hall about Elizabeth’s self-destructive behavior from February 1999 to April 10, 2000, including the report that Elizabeth was planning to commit suicide on April 10, 2000. Davis-Millis reported these incidents to Henderson and had several conversations with him discussing Elizabeth’s fragile state. Henderson received reports from Elizabeth’s professors, GRTs, and Davis-Millis who were concerned for her safety. Henderson met with Elizabeth on numerous occasions to discuss her mental health. On one occasion, on November 9, 1999, Henderson referred Elizabeth to MIT Mental Health for an immediate assessment after observing self-inflicted wounds. Henderson was also in regular communication with MIT psychiatrists regarding Elizabeth’s treatment. Additionally, Henderson attended weekly “deans and psychs” meetings, including the meeting on April 10 where Elizabeth’s mental problems were discussed with other MIT medical professionals. The Plaintiffs have provided sufficient evidence that Henderson and Davis-Millis could reasonably foresee that Elizabeth would hurt herself without proper supervision. Accordingly, there was a “special relationship” between the MIT Administrators, Henderson and Davis-Millis, and Elizabeth imposing a duty on Henderson and Davis-Millis to exercise reasonable care to protect Elizabeth from harm.

B. Gross Negligence (Count VIII)

The Plaintiffs have provided sufficient evidence that Henderson and Davis-Millis were actively a part of Elizabeth’s “treatment team.” As discussed in the analysis of the MIT Medical Professionals’ motion for *578 summary judgment, as a “treatment team,” the professionals and administrators failed to secure Elizabeth’s short-term safety in response to Elizabeth’s suicide plan in the morning hours of April 10. By not formulating and enacting an immediate plan to respond to Elizabeth’s escalating threats to commit suicide, the Plaintiffs have put forth sufficient evidence of a genuine issue of material fact as to whether the MIT Administrators were grossly negligent in their treatment of Elizabeth. Accordingly, the MIT Administrators’ motion for summary judgment as to Count VIII for gross negligence is DENIED.

C.Negligence/Wrongful Death (Counts VI and VII)

For the same reasons discussed in the gross negligence analysis, the Plaintiffs have provided sufficient evidence to raise a genuine issue of material fact as to whether the MIT Administrators breached their duly and proximately caused Elizabeth’s death. See Mullins, 389 Mass, at 56, 58 (questions of negligence and causation are generally questions of fact for the jury). Accordingly, the MIT Administrators’ motion for summary judgment as to Count VI for negligence and Count VII for wrongful death is DENIED.

D.Conscious Pain & Suffering (Count DQ

In the ambulance on the way from the scene of the fire to Massachusetts General Hospital, Elizabeth showed signs of a non-verbal level of consciousness. The Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether Elizabeth experienced conscious suffering beyond sheer speculation. See Baldassare v. Crown Furniture Co., Inc., 349 Mass. 183, 195 (1965). Accordingly, the MIT Administrators’ motion for summary judgment as to Count IX for conscious pain and suffering is DENIED.

E.Negligent Infliction of Emotional Distress (Count X)

For the same reasons discussed in the analysis of NIED for the MIT Medical Professionals’ motion for summary judgment, the MIT Administrators’ motion for summary judgment as to Count X for NIED is ALLOWED.

F.Negligent Misrepresentation (Count V)

In order to recover for negligent misrepresentation, the plaintiff must prove that the defendant “(1) in the course of his business, (2) supplie(d) false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others!,] (5) by their justifiable reliance upon the information, and [that he] (6) . . . fail[ed] to exercise reasonable care or competence in obtaining or communicating the information.” Golber v. Baybank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999).
Federal courts interpreting Massachusetts law have held that colleges and universities, as charitable corporations, are not engaged in “trade or commerce” for purposes of c. 93A “when [they] undertake!] activities in furtherance of [their] core mission.” Trustees of Boston Univ., 33 F.Sup.2d at 77. In fact, a university is not engaged in “trade or commerce” when they are in relationships that involve services “purely incidental to the university’s educational mission.” Linkage Corp., 225 Mass. at 25; see also Thorton, 2 F.Sup.2d at 95 (university’s student financial aid administration was not engaged in “trade or commerce” because the alleged misleading advertising was taken in furtherance of its core mission, not in a “business context”).
Applying the courts’ analysis in these c. 93A cases to the instant case, any relationship between the MIT Administrators and the Plaintiffs did not occur in the context of a “business transaction” because any representations about MIT’s medical services were “purely incidental” to MITs “educational mission.” See Id. Therefore, the Plaintiffs can not establish an essential element of their negligent misrepresentation claim. Accordingly, the MIT Administrators’ motion for summary judgment as to Count V for negligent misrepresentation is ALLOWED.

ORDER

For the foregoing reasons, MITs motion for summary judgment on Counts I, II, III and IV is ALLOWED. Dean Arnold Henderson's and Nina Davis-Millis’ motion as to Counts V and X are ALLOWED and as to Counts VI, VII, VIII, and IX is DENIED. MIT psychiatrists Reich’s, Cunningham’s and Van Niel’s motion as to Counts XV and XVI is ALLOWED and as to Count XIII is DENIED. MIT psychiatrist Girard’s motion as to Count XV and XVI is ALLOWED and as to Counts XI, XII, XIII, and XIV is DENIED.

Reich testified that he was not aware of Elizabeth’s suicide plan to kill herself at the time of the meeting.

The BU brochures touted BU’s “highly trained staff’ and the option of “reasonable accommodations in testing and coursework” which would “be available throughout the student’s academic career.” Id. at 151.

Likewise, in Sullivan v. Boston Architectural Center, Inc., the court found an enforceable contract where the defendant’s policies and procedures “contained well-defined processes for addressing the plaintiffs grievance.” 57 Mass.App.Ct. 771, 774 (2003). However, the defendant “made these procedures available to the plaintiff and applied them as articulated.” Id. Therefore, the defendant satisfied any “reasonable expectation[s]” its policies generated and the court granted the defendant’s motion for summaiy judgment. Id.